FILED
2016 Aug-01  PM 06:02
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL ADAMS,** | ) | |
| **NATALIE ADAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-CV-01855-RDP** |
| | ) | |
| **BANK OF AMERICA, N.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## DEFENDANT'S MEMORANDUM IN SUPPORT ITS MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS…………..2

III.   ARGUMENT AND CITATION OF AUTHORITY………………..8

    A. Summary Judgment Standard Under FED. R. CIV. P. 56…………8

    B. Plaintiffs Do Not Have a Breach of Contract Claim……………..8

        1.  Plaintiffs Did Not Successfully Complete the Trial Period Plan……………………………………………...9

        2.  Plaintiffs Did Not Perform Their Contractual Obligations…………………………………………10

        3.  BANA Did Not Commit Any Breach………………...12

            i.    Application of Payments…………………………12

            ii.   Notice……………………………………………13

            iii.  HUD Regulations…………………………………14

    C. Plaintiffs Cannot Establish a Prima Facie Case of Defamation, Libel, or Slander………………………………………………16

    D. Plaintiffs' Claim Under the Truth in Lending Act Fails as a Matter of Law……………………………………………………18

    E. BANA Properly Acknowledged and Responded to Plaintiffs' QWR………………………………………………………..21

    F. BANA Never Received Notice of a Credit Dispute from a CRA...23

    G. BANA is Not Liable Under the FDCPA…………………………25

    H. Plaintiffs Consented to BANA Calling Their Cell Phones……….27

    I.  Plaintiffs Were Not Victims of Discrimination……………………28

IV.   CONCLUSION………………………………………………...30

Defendant Bank of America, N.A. ("BANA" or "Defendant"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 56, respectfully submits this Memorandum in Support of its Motion for Summary Judgment. As shown below, Plaintiffs Michael and Natalie Adams ("Plaintiffs") cannot adduce substantial evidence to raise a genuine issue of material fact as to any of their claims, and BANA is therefore entitled to judgment as a matter of law.

## I.   <u>Introduction</u>

This is a simple case of two borrowers who defaulted on a mortgage and are attempting to use a scattershot complaint to shift the blame to BANA and avoid their payment obligations. Plaintiffs first began having real difficulty making their mortgage payments due to issues at work. With continually changing jobs and fluctuating salaries, Plaintiffs struggled to make their mortgage payments each month. As a result, their payments were late, and they would often go months at a time without making any payments at all. To alleviate their burden and address their default, Plaintiffs sought multiple loan modification from BANA. BANA worked diligently with the Plaintiffs and agreed to modify their loan multiple times to help them stay in their home. Despite receiving reduced monthly payments, however, Plaintiffs still failed to perform under their duties under the mortgage contract. Indeed, following their last loan modification, Plaintiffs went 27 months where the only attempts at payments they made were a check that that was returned for insufficient funds, and another check far below the required monthly amount.

Despite their repeated failures to comply with their contractual responsibilities—even when modified—Plaintiffs insisted that they receive yet another loan modification. Once again, BANA sought to work with Plaintiffs, and BANA offered to modify their loan on the simple condition that Plaintiffs make timely payments for three consecutive months. Plaintiffs failed to do so. Consequently, given Plaintiffs' severe default and inability to comply with the preconditions

for receiving a loan modification, BANA was forced to initiate foreclosure proceedings. Before BANA could conduct a foreclosure sale, however, Plaintiffs filed this lawsuit in a last ditch effort to keep their house.

The gravamen of Plaintiffs' complaint against BANA is that BANA should have worked with them more to receive another loan modification. Plaintiffs contend that BANA was not adequately responsive to their calls, repeatedly transferred them to other representatives, and generally made them feel frustrated. While such allegations may be appropriate substance for a customer service complaint, they are insufficient to support an actionable claim in a court of law.

Accordingly, as a matter of law, none of Plaintiffs' claims can survive summary judgment. In view of BANA's evidence below, there is no genuine dispute as to any material fact, and Plaintiffs' legal arguments are not cognizable under Alabama or Federal law. Consequently, BANA's Motion for Summary Judgment is due to be granted in full.

## II.   <u>Statement of Undisputed Material Facts</u>

1.      On October 25, 2001, Plaintiffs executed a promissory note (the "Note") in the amount of $104,492.65 in favor of Countrywide Home Loans, Inc. The promissory note was secured by a Mortgage (the "Mortgage," and together with the Note, the "Loan") on real property located at 1132 Ferro Avenue, Bessemer, Alabama 35020 (the "Property"). (Affidavit of ___ for BANA, attached hereto as **Attachment 1**, ¶ 5 [hereinafter "___ Aff."]; Deposition of Michael Shawn Adams, attached hereto as **Attachment 2**, 40:25-41:8; 43:22-25 [hereinafter "M. Adams Dep."]; Deposition of Natalie Adams, attached hereto as **Attachment 3**, 23:4-14 [hereinafter "N. Adams Dep."]; **Exhibits A** and **B**).

2.      BANA has serviced the Loan since its origination, as BANA succeeded to the interests of BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP—the

original entity servicing the Loan. (___ Aff., ¶ 6; Deposition of Lonnie Mills, attached hereto at **Attachment 4**, 26:10-27:6 [hereinafter "Mills Dep."]).

3.      The beneficial ownership and accompanying rights and obligations under the Mortgage were assigned to BANA on August 2, 2011. (___ Aff., ¶ 7; **Exhibit C**).

**Failure to Make Mortgage Payments and 2004 and 2011 Loan Modifications**

4.      Starting in 2004, Plaintiffs began falling behind on making their monthly mortgage payments and faced foreclosure as a result of their default. (*See* (___ Aff., ¶ 8; Mills Dep. 32:10-13; **Exhibit D**).

5.       Plaintiffs sought a loan modification, and BANA offered to modify the terms of the Loan such that Plaintiffs would no longer be in default. (___ Aff., ¶ 9). Plaintiffs agreed to and executed a loan modification agreement and amended and restated Note on October 8, 2004 (the "2004 Loan Modification"). (___ Aff., ¶ 9; M. Adams Dep. 49:14-18; 50:8-23; N. Adams Dep. 23:15-21; 23:22-24:15; **Exhibits E** and **F**).

6.      Despite receiving the 2004 Loan Modification, Plaintiffs struggled once again to make their mortgage payments due to a reduction in their previous household income. (M. Adams Dep. 79:15-17; N. Adams Dep. 27:9-16).

7.      Due to Plaintiffs' continued struggles to make their mortgage payments, BANA offered to modify their Loan once again. (___ Aff., ¶ 10; M. Adams Dep. 76:5-10; N. Adams Dep. 24:16-21; **Exhibit G**). Plaintiffs accepted this offer. (*Id.*).

8.      On August 29, 2011, Plaintiffs agreed to and executed a loan modification agreement and amended and restated Note (the "2011 Loan Modification").[1] (___ Aff., ¶ 11; M.

---

[1] For the Court's reference, all further mentions of the "Note" and "Mortgage" should be taken to mean the Note and Mortgage as amended by the 2011 Loan Modification.

Adams Dep. 77:12-18; 78:15-22; N. Adams Dep. 24:24-25:12; **Exhibits H** and **I**). The 2011 Loan Modification made the Plaintiffs current on the Loan and reduced their monthly principal and interest payment to $530.23 and interest rate to 4.625%. (___ Aff., ¶ 11; **Exhibits H** and **I**). BANA has held the amended and restated Note since its execution. (___ Aff., ¶ 11).

**<u>Repeated Failure to Make Mortgage Payments and Start of the Foreclosure Process</u>**

9.      Even after receiving the 2011 Loan Modification, the Plaintiffs continued to struggle to make their mortgage payments each month due to fluctuations of income and loss of employment. (M. Adams Dep. 81:14-24).

10.     According to BANA's records, Plaintiffs only attempted to make two mortgage payments from the time period spanning August 1, 2012 – November 25, 2014. (___ Aff., ¶ 12; Mills Dep. 67:4-69:8; **Exhibit J**). The Plaintiffs made one of these payments on September 7, 2012 for only $400, and BANA subsequently returned it because it was not enough for a full mortgage payment. (___ Aff., ¶ 12; Mills Dep. 67:7-21). The Plaintiffs attempted to make the other payment on January 31, 2013, but their check was returned due to insufficient funds in the Plaintiffs' bank account. (___ Aff., ¶ 12; Mills Dep. 68:8-17).

11.     Concerning the $400 payment, Plaintiffs contend that they actually sent in a full payment on September 7, 2012, but BANA would not accept it. (M. Adams Dep. 85:15-19). That said, Plaintiffs could not identify, or recall having, any documentation in support of their position. (*Id.* at 85:20-23).

12.     Due to Plaintiffs' failure to make any mortgage payments during the August 1, 2012 – November 25, 2014 time period, BANA initiated the foreclosure process and, on September 17, 2012, sent Plaintiffs a notice of intent to accelerate the Loan. (___ Aff., ¶ 13; Mills Dep. 104:22-106:16; **Exhibit K**).

13.     On September 20, 2012, BANA sent Plaintiffs a letter offering to schedule a face-to-face meeting to discuss the possibility of loan assistance. (___ Aff., ¶ 14; **Exhibit L**). Plaintiffs did not attempt to schedule a face-to-face meeting. (___ Aff., ¶ 14). Nonetheless, on both September 24 and September 25, 2012, a representative from BANA attempted to meet with the Plaintiffs at the Property, but to no avail. (___ Aff., ¶ 14; Mills Dep., 128:15-20 (Errata Sheet)).[2]

### The Attempt for a Third Loan Modification

14.     Due to the Plaintiffs' persistent lack of steady income, they once more attempted to obtain a modification of their loan. (M. Adams Dep. 89:21-90:8; 91:14-92:1; 92:13-93:14; N. Adams Dep. 27:9-16).

15.     On April 1, 2013, March 8, 2014, and July 21, 2014, Plaintiffs submitted applications to be considered for a loan modification. (___ Aff., ¶ 15; M. Adams Dep. 89:21-90:4; 91:14-22; 92:20-93:4; N. Adams Dep. 25:13-19; 26:8-14; 26:23-27:5; **Exhibits M**, **N**, and **O**).

16.     On each of these signed applications, both Plaintiffs provided their respective cell phone number. (M. Adams Dep. 12:10-13:4; N. Adams Dep. 9:16-25).

17.     Furthermore, by signing each of these applications Plaintiffs acknowledged, "I consent to being contacted concerning this request for mortgage assistance at any e-mail addresses or cellular or mobile telephone number I have provided to the Servicer." (___ Aff., ¶ 16; **Exhibits M**, **N**, and **O**).

---

[2] During Mr. Mills' 30(b)(6) deposition, Plaintiffs' counsel asked whether BANA had conducted a face-to-face meeting with the Plaintiffs. (Mills Dep., 125:15-23). Mr. Mills responded by saying that he did not know the answer at that time, but that he would conduct additional research. (*Id.*, 126:18-21). Plaintiffs' counsel noted that Mr. Mills could correct his testimony regarding this question if he found any relevant information. (*Id.*). Mr. Mills subsequently found evidence that BANA did attempt to conduct a face-to-face meeting, and corrected his testimony through his errata sheet, attached for the Court's reference.

18.     In response to Plaintiffs' requests for assistance, BANA agreed to work with the Plaintiffs and offered them a Trial Period Plan on September 3, 2014, as a possible means of securing a permanent loan modification. (___ Aff., ¶ 17; M. Adams Dep. 104:22-105:5; **Exhibit P**). To successfully complete this Trial Period Plan and obtain a permanent modification, Plaintiffs were required to return a signed copy of the Trial Period Plan Agreement and remit payment of $935.72 on October 1, 2014, November 1, 2014, and December 1, 2014. (___ Aff., ¶ 17; M. Adams Dep. 105:18-23; **Exhibit P**).

19.     BANA never received an executed copy of the Trial Period Plan Agreement. (___ Aff., ¶ 18; Mills Dep. 74:17-75:7; **Exhibit Q**).

20.     According to BANA's records, Plaintiffs did not make a Trial Period Plan payment in October 2014. (___ Aff., ¶ 19; Mills Dep. 114:9-116:24; **Exhibit J**). Plaintiffs did not make their November Trial Period Plan payment until November 26, 2014. (*Id.*). Finally, Plaintiffs did not make another Trial Period Plan Payment until January 2, 2015. (*Id.*). BANA applied these payments the same day that they were received. (___ Aff., ¶ 19; *see also* Mills Dep. 115:15-25).

21.     Plaintiffs contend that they made their Trial Period Plan Payments on October 1, 2014, November 1, 2014, and December 1, 2014. (M. Adams Dep. 105:24-106:1; N. Adams 38:3-7).That said, Plaintiffs admit that they have no financial documentation to support this position. (N. Adams Dep. 34:12-21).

22.     On April 11, 2015, BANA did not approve Plaintiffs for what would have been their third loan modification. (___ Aff., ¶ 20, **Exhibit R**). BANA's decision was based on Plaintiffs' failure to submit their Trial Period Plan payments on October 1, 2014, November 1, 2014, and December 1, 2014 as required in their initial Trial Period Plan offer. (*Id.*).

**Events Leading Up to the Current Lawsuit**

23.     In an attempt to avoid foreclosure, Plaintiffs hired legal counsel. (N. Adams 40:9-42:1).

24.     On July 17, 2015, Plaintiffs' counsel sent a Qualified Written Request ("QWR") to BANA. (___ Aff., ¶ 21; M. Adams Dep. 93:18-95:1; **Exhibit S**). On July 22, 2015, BANA acknowledged receipt of the QWR. (___ Aff., ¶ 21, M. Adams Dep. 95:2-11; **Exhibit T**). On August 21, 2015, BANA's counsel sent a letter responding to Plaintiffs' QWR. (___ Aff., ¶ 21; M. Adams Dep. 96:8-97:1; **Exhibit U**). BANA has no record of receiving any other QWRs besides the QWR dated July 17, 2015. (___ Aff., ¶ 21).

25.     Plaintiffs admit that they did not send any additional QWRs to BANA beyond the QWR dated July 17, 2015. (M. Adams Dep. 98:15-99:4).

26.     Plaintiffs also attempted to dispute their credit report with BANA. (M. Adams Dep. 70:2-11). Plaintiffs admit, however, that they never attempted to notify a consumer reporting agency about their disputed credit. (*Id.* at 71:6-19; N. Adams Dep. 46:2-8). Furthermore, BANA has no record of receiving any notice from a consumer reporting agency about a credit dispute concerning the Loan. (___ Aff., ¶ 22).

27.     Although BANA initiated the foreclosure process, BANA did not complete a foreclosure sale concerning the Property. (___ Aff., ¶ 23; N. Adams Dep. 41:20-42:1). Furthermore, no other entity, including BANA, has attempted to complete a foreclosure sale following the initiation of the present lawsuit. (___ Aff., ¶ 23).

**<u>Litigation</u>**

28.     Plaintiffs sued BANA on September 20, 2015. (Doc. 1-A). After removal, and a series of amendments, Plaintiffs' Second Amended Complaint accuses BANA of breach of contract; defamation, libel, slander; violations of Truth in Lending; violations of the Real Estate

Settlement Procedures Act; violations of the Fair Credit Reporting Act; violations of the Fair Debt Collection Practices Act; violations of the Telephone Consumer Protection Act; and violations of the Equal Credit Opportunity Act.

29.     Currently, Plaintiffs are not making any payments on the Loan. (M. Adams Dep. 52:6-9). The Loan is currently in default owing for the November 2012 payment and all subsequent payments. (___ Aff., ¶ 24; **Exhibit J**).

30.     BANA now files its Motion for Summary Judgment and contends that Plaintiffs have failed to raise an issue of material fact as to any of their claims.

### III.     Argument and Citation of Authority

### A.     Summary Judgment Standard Under FED. R. CIV. P. 56

FED. R. CIV. P. 56 requires that summary judgment be granted when "there is no issue as to any material fact." In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002). Where the record taken as a whole, however, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). If the evidence is merely colorable, or not significantly probative, summary judgment may be granted. *See Matsushita*, 475 U.S. at 586. The evidence here demonstrates that Plaintiffs cannot offer any disputed material facts and the applicable law offers no support to their claims for relief.

### B.     Plaintiffs Do Not Have a Breach Contract Claim

To properly allege a breach of contract claim (Count One) under Alabama law, a plaintiff must prove the following elements: "(1) a valid contract binding the parties; (2) the [claimant's] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."

*Capmark Bank v. RGR, LLC*, 81 So.3d 1258, 1267 (Ala. 2011) (quoting *Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002)).

### 1. Plaintiffs Did Not Successfully Complete the Trial Period Plan

As an initial matter, because Plaintiffs failed to comply with the express conditions of the Trial Period Plan, they did not receive a third loan modification. (___ Aff., ¶ 20, **Exhibit R**). Therefore, the 2011 Loan Modification is the controlling contract in this case. (*See* **Exhibits B**, **G** and **I**). Alabama law is clear that "[a] failure to perform a condition precedent to formation of a contract results in a nonbinding agreement." *Jackson v. Wells Fargo Home Mortgage, N.A.*, 159 So. 3d 58, 67 (Ala. Civ. App. 2014) (citing *Reeves Cedarhurst Dev. Corp. v. First American Fed. Sav. & Loan Ass'n*, 607 So.2d 180, 182 (Ala. 1992)).

In September 2014, BANA attempted to review Plaintiffs for what would have been their third loan modification. (___ Aff., ¶ 17; M. Adams Dep. 104:22-105:5; **Exhibit P**). Before agreeing to this third loan modification, however, BANA established two conditions precedent through the Trial Period Plan. (___ Aff., ¶ 17; M. Adams Dep. 105:18-23; **Exhibit P**). Plaintiffs were required to (1) return a signed copy of the Trial Period Plan Agreement; and (2) remit payment of $935.72 on October 1, 2014, November 1, 2014, and December 1, 2014. (___ Aff., ¶ 17; M. Adams Dep. 105:18-23; **Exhibit P**). Plaintiffs failed to satisfy both of these conditions precedent. (___ Aff., ¶¶ 18 – 19).

First, Plaintiffs never executed the Trial Period Plan Agreement. (___ Aff., ¶ 18; Mills Dep. 74:17-75:7; **Exhibit Q**). Second, Plaintiffs did not submit their October Trial Period Plan payment at all; submitted their November Trial Period Plan payment on November 26, 2014; and submitted their December Trial Period Plan payment on January 2, 2015. (___ Aff., ¶ 19; Mills Dep. 114:9-116:24; **Exhibit J**). The November 26, 2014 and January 2, 2015 Trial Period Plan payments were

applied the day that they were received without delay. (___ Aff., ¶ 19; *see also* Mills Dep. 115:15-25). Accordingly, Plaintiffs failed to satisfy the condition precedent of making three payments of $935.72 on October 1, 2014, November 1, 2014, and December 1, 2014. (___ Aff., ¶ 10; Mills Dep. 114:9-116:24; **Exhibit J**).

Plaintiffs failed to comply with the two conditions precedent under the Trial Period Plan; therefore, they did not receive a third loan modification, and no new, binding contract was created as between BANA and Plaintiffs. *See Jackson*, 159 So. 3d at 67 (citing *Reeves*, 607 So.2d at 182. Accordingly, the last modification of the Mortgage and Note, the 2011 Loan Modification, is the operative agreement for determining whether Plaintiffs' breach of contract claims lies.

### 2.    Plaintiffs Did Not Perform Their Contractual Obligations

Plaintiffs' breach of contract claim cannot succeed because they failed to make their mortgage payments each month in a timely manner as required by the Mortgage and the Note. (___ Aff., ¶ 12; M. Adams 81:11-24; N. Adams 34:22-25; **Exhibits H – J**). Indeed, following the execution of the 2011 Loan Modification, Plaintiffs went 27 months—August 1, 2012 through November 24, 2014—without making any regular mortgage payments. (___ Aff., ¶ 12; Mills Dep. 67:4-69:8; **Exhibit J**). During this 27-month timespan, Plaintiffs' only payment activity was a $400 check from September 7, 2012 that was not enough for a full payment and thus returned, and a bounced check from January 31, 2013. (___ Aff., ¶ 12; Mills Dep. 67:7-68:17; *see also* **Exhibit J**). Additionally, Plaintiffs admit that they have not made a regular mortgage payment since at least April 2015—over five months prior to filing their lawsuit in September 2015. (M. Adams Dep. 52:16-19). Given Plaintiffs' haphazard payment regimen, the Loan is currently due and owing for the November 2012 payment and all subsequent payments. (___ Aff., ¶ 24; **Exhibit J**).

The Mortgage requires that the Borrowers comply with the payment terms specified in the Note. (**Exhibit B**, ¶ 1). The Note specifically directs the Plaintiffs to make payments of principal and interest for $530.23 on the first of each month starting from November 1, 2011. (**Exhibit I**, ¶ 4). Plaintiffs' decision to go months at a time without making any payments—e.g. August 1, 2012 through November 24, 2014 and April 2015 through September 2015—violates the clear terms of both the Mortgage and Note. (**Exhibits B** and **H – I**). Specifically, the Mortgage states that failure to make timely mortgage payments constitutes a default. (**Exhibit B**, ¶ 9(a)).

Plaintiffs' only defense in response is that they were not required to make their mortgage payments if they were unable to afford them. (M. Adams 41:22-42:8). Furthermore, Plaintiffs contend that BANA was required to help them with their payments if Plaintiffs encountered any difficulties. (*Id.* at 42:9-13; 48:3-7). Plaintiffs completely mischaracterize both their and BANA's contractual rights and obligations. In contrast to the Plaintiffs' interpretations, the Mortgage and Note, unconditionally require the Plaintiffs to make a mortgage payment each and every month for the life of the Loan. (**Exhibit B**, ¶ 9(a); **Exhibit I**, ¶4). The failure to comply with this monthly payment obligation constitutes a default. (**Exhibit B**, ¶ 9(a)). The occurrence of a default allows BANA to initiate foreclosure proceedings. (*Id.*, ¶ 18; **Exhibit C**). As such, BANA had no obligation to grant Plaintiffs any additional loan modifications—something that BANA attempted to offer nonetheless—and were completely justified in initiating foreclosure due to the Plaintiffs' repeated pattern of missed payments. (___ Aff., ¶ 11; **Exhibits B – C**; *see also* **Exhibit J**).

 Plaintiffs' failure to make all of their monthly mortgage payments following the 2011 Loan Modification constituted a breach and entitled BANA to institute foreclosure proceedings. *See Carmichael v. Saxon Mortgage Servs., Inc.*, No. 2:11-CV-1110-MEF, 2013 WL 4786120, at *5 (M.D. Ala. Sept. 6, 2013). Furthermore, Plaintiffs' breach of contract claim must fail because

they cannot establish their own performance under the contract. *Capmark Bank*, 81 So.3d at 1267 (quoting *Reynolds*, 825 So.2d at 105). In other words, a party who commits an unexcused, material breach of his or her mortgage agreement cannot then use that same mortgage agreement to hold another party liable. *Forester v. Bank of Am., N.A.*, No. CIV.A. 11-0160-CG-M, 2012 WL 3206471, at *6 (S.D. Ala. Aug. 7, 2012) (citing *Walker v. Harris,* 235 Ala. 384, 386 (1938)). In sum, Plaintiffs' failure to make their monthly mortgage payments constituted a breach, and this breach is fatal to their breach of contract claim. *See id.* BANA is due summary judgment as to Count One.

### 3.      BANA Did Not Commit Any Breach

BANA performed all of its obligations under the Mortgage and Note. Accordingly, Plaintiffs' breach of contract claim fails for this additional reason.

Plaintiffs' breach of contract claim names three principal grievances: (1) BANA misapplied payments; (2) BANA failed to provide the required notices; and (3) BANA failed to comply with applicable HUD regulations before initiating foreclosure proceedings. (Doc. 24, ¶¶ 28-30). Each of these allegations lack merit.

### i.      Application of Payments

Turning to the alleged misapplication of payments, Plaintiffs have failed to provide any evidence to substantiate their claims. In their Second Amended Complaint and depositions, Plaintiffs pointed to three potential times where payments were misapplied or improperly returned. In order, these instances were September 7, 2012 (M. Adams Dep. 85:9-19); January 31, 2013 (M. Adams Dep. 88:21-89:11); and January 2015 (Doc. 24, ¶ 28). Plaintiffs are mistaken on all accounts. Plaintiffs' payment from September 7, 2012 was only for $400, and BANA subsequently returned it because it was not enough for a full mortgage payment. (___ Aff., ¶ 12; Mills Dep.

67:7-21). Plaintiffs' payment from January 31, 2013 was a bounced check that was not applied due to insufficient funds in Plaintiffs' bank account. (___ Aff., ¶ 12; Mills Dep. 68:8-17). Concerning the payment from January 2015, BANA duly applied the payment of $935.72 that it received on January 2, 2015. (*See* ___ Aff., ¶ 19; Mills Dep. 114:9-116:24; **Exhibit J**). As such, all of Plaintiffs' stated instances of misapplied or improperly returned payments lack merit, as these payments were either (1) insufficient to make a full mortgage payment and thus returned; (2) represented a bad check that could not be applied; or (3) duly applied by BANA. (___ Aff., ¶¶ 12, 18; Mills Dep. 67:7-68:17, 114:9-116:24).

Beyond the three specific instances mentioned above, Plaintiffs make vague allusions to other payments that were also returned by BANA. (*E.g.*, M. Adams Dep. 86:6-16). Plaintiffs stated that over the course of 2012 and 2014 "there was a few scattered out," referring to returned payments by BANA. (*Id.* at 86:6-11). Plaintiffs have failed to produce any evidence that this was the case. As such, Plaintiffs cannot raise a genuine issue of material fact on this issue of misapplied or improperly returned payments.

### ii.    Notice

Next, Plaintiffs allege that BANA did not provide them with proper notices of foreclosure as required by the Mortgage. (Doc. 24, ¶ 30). First, BANA provided the Plaintiffs with a notice of intent to accelerate on September 17, 2012. (___ Aff., ¶ 13; Mills Dep. 104:22-106:16; **Exhibit K**). Second, Plaintiffs admit in their Second Amended Complaint that they received notice from BANA's counsel on June 12, 2015 that Plaintiffs were in default, and that BANA had accelerated the Loan. (Doc. 24, ¶ 81). Finally, under the Mortgage, BANA only had an affirmative duty to provide the Plaintiffs with foreclosure-related notices when BANA invoked the power of sale. (**Exhibits B**, ¶ 18; *see also* **Exhibit C**).

Alabama law is clear that the power of sale is not invoked by merely scheduling a foreclosure sale. *Buckentin v. SunTrust Mortgage Corp.*, 928 F. Supp. 2d 1273, 1282 (N.D. Ala. 2013) (quoting *Hardy v. Jim Walter Homes, Inc.*, No. 06-0687-WS-B, 2007 WL 174391, at \*6 (S.D. Ala. 2007) ("Plaintiffs have cited no Alabama authority, and the undersigned has found none, under which the mere scheduling of a foreclosure sale, without more, has been found to constitute a mortgagee's exercise of the power of sale.")). Here, although a foreclosure sale was scheduled for the Property, it was never completed. (___ Aff., ¶ 23; N. Adams Dep. 41:20-42:1). Accordingly, BANA's duty to provide foreclosure-related notices was never triggered. (*See* **Exhibit B**, ¶ 18; *see also* **Exhibit C**).

Taken together, this means that BANA voluntarily provided multiple notices of pertaining to the foreclosure that were not required by the Mortgage. (*See* ___ Aff., ¶ 13; Mills Dep. 104:22-106:16; **Exhibit K**; Doc. 24, ¶ 81). Accordingly, this component of Plaintiffs' breach of contract argument also fails.

### iii. HUD Regulations

Lastly, Plaintiffs argue that BANA breached the Mortgage by failing to adhere to applicable HUD regulations, pertaining to loss mitigation, prior to instituting foreclosure proceedings. (Doc. 24, ¶ 29). This argument is irrelevant as these HUD regulations do not provide a basis for alleging a breach of contract claim. *See Campbell v. Bank of Am., N.A.*, 141 So. 3d 492, 499 (Ala. Civ. App. 2012)

Regarding the HUD regulations, Plaintiffs specifically reference Paragraph 9(d) of the Mortgage contract which incorporates relevant HUD rules and regulations into the agreement. (**Exhibit B**, ¶ 9(d)). This provision requires Bank of Bank America to offer loss mitigation options prior to instituting foreclosure proceedings. (*Id.*). Yet, when presented with this identical

Paragraph 9(d), the Alabama Court of Civil Appeals held that non-compliance with HUD loss-mitigation regulations could at most serve as an affirmative defense to foreclosure. *Campbell v. Bank of Am., N.A.*, 141 So. 3d 492, 499 (Ala. Civ. App. 2012). The court further went on to favorably cite the proposition that "the mortgagor 'may not advance, as an affirmative cause of action, a State law contract claim based on an asserted breach of the HUD regulations.'" *Id.* (quoting *Wells Fargo Home Mortgage, Inc. v. Neal*, 922 A.2d 538, 541 (Md. 2007)). Based on the court's reasoning, while Plaintiffs may use alleged violations of Paragraph 9(d) as a shield to attempt and stay foreclosure proceedings, they may not use it as a sword to attack BANA under a breach of contract theory. *See Campbell*, 141 So. 3d at 498-99.

Furthermore, Plaintiffs have provided zero evidence that BANA did not comply with applicable HUD regulations prior to beginning foreclosure. For example, Plaintiffs allege that BANA did not conduct a face-to-face interview with them to discuss loss mitigation options. (Doc. 24, ¶ 29). This is untrue. BANA sent a letter on September 20, 2012 and attempted to schedule a face-to-face meeting with Plaintiffs (___ Aff., ¶ 14; **Exhibit L**). Further, on September 24, 2012 and September 25, 2012, a BANA representative tried to meet with Plaintiffs on two different occasions at the Property. (___ Aff., ¶ 14; Mills Dep., 128:15-20 (Errata Sheet)).

The remainder of Plaintiffs' allegations related to HUD regulations are similarly ill-founded and lack any supporting evidence. (*See* 2d Am Compl., ¶ 29). The bottom line is that BANA modified Plaintiffs' Loan on two separate occasions and was willing to consider Plaintiffs for third loan modification; however, Plaintiffs were unable to comply with the conditions precedent contained within the Trial Period Plan. (___ Aff., ¶¶ 17 – 19). The notion that BANA failed "to engage in loss mitigation prior to instituting foreclosure" is baseless and cannot survive summary judgment. (*See* Doc. 24, ¶ 29).

15

Because BANA did not breach the Mortgage and Note, Plaintiffs' breach of contract claim once again must be disposed of via summary judgment.

### C.   Plaintiffs Cannot Establish a Prima Facie Case of Defamation, Libel, or Slander

Plaintiffs' claim for defamation, libel, and slander (Count Two) is based on the allegation that BANA "published in the newspaper and on the internet false information regarding [Plaintiffs'] account being in default and false information regarding [BANA's] right to conduct a foreclosure sale on the [Plaintiffs'] property. (Doc. 24, ¶ 33). Such allegations are completely contradicted by the evidence BANA presents.

"There are two types of defamation: libel, which involves the use of print media to publish a defamatory comment; and slander, which involves the oral expression of a defamatory comment." *Corp. Am. Car Wash Sys. v. City of Birmingham*, No. 2:14-cv-781, 2016 WL 837718, at *7 (N.D. Ala. Mar. 4, 2016) (citing *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 390 (Ala. Civ. App. 1999)). In either case, to state a claim a plaintiff must sufficiently plead four elements:

> "1) a false/defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement."

*See Temploy, Inc. v. Nat'l Council on Comp. Ins.*, 650 F. Supp. 2d 1145, 1155 (S.D. Ala. 2009) (citing *Delta Health Grp. Inc. v. Stafford*, 887 So. 2d 887, 895-96 (Ala. 2004)).

Regarding the requirement for a false/defamatory statement, everything that BANA published concerning the Plaintiffs and the scheduled foreclosure sale was truthful. As discussed above, Plaintiffs were in severe default on their Loan. (___ Aff., ¶ 12; Mills Dep. 67:4-69:8; **Exhibit J**). Indeed, following the execution of the 2011 Loan Modification, Plaintiffs went 27 months—August 1, 2012 through November 24, 2014—without making any regular mortgage

payments. (___ Aff., ¶ 12; Mills Dep. 67:4-69:8; **Exhibit J**). As such, BANA's statements about the Plaintiffs' default were undoubtedly true. (*See id.*). Secondly, under the terms of the Mortgage, Plaintiffs' default gave BANA the right to initiate foreclosure proceedings. (**Exhibit B**, ¶ 18; *see also* **Exhibit C**). Moreover, Alabama state and Federal courts are clear that possession of a promissory note permits the holder to initiate foreclosure proceedings. *Graveling v. Castle Mortgage Co.*, 631 F. App'x 690, 696 (11th Cir. 2015) (quoting *Thomas v. Wells Fargo Bank, N.A.*, 116 So. 3d 226, 233 (Ala. Civ. App. 2012)). Accordingly, BANA, per the terms of the Mortgage, and as holder of the Note, had a right to foreclose on the Property after the Plaintiffs defaulted. (___ Aff., ¶ 11; **Exhibits B** and **I**). As such, the truthfulness of BANA's statements regarding both the Plaintiffs' default and BANA's right to foreclose defeats any claim of defamation. *See Temploy, Inc.*, 650 F. Supp. 2d at 1155 (citing *Stafford*, 887 So. 2d at 895-96).

In addition to Plaintiffs' inability to prove a false/defamatory statement, Plaintiffs also cannot show that they suffered a "special harm" resulting from BANA's statements. *See id.* A defamation claim is actionable "irrespective of special harm" only where the defamatory statement "imputes to the plaintiff an indictable offense involving infamy or moral turpitude." *See Deneau v. Orkin, LLC*, No. 1:11-cv-455, 2013 WL 2178045, at *19 (S.D. Ala. May 20, 2013) (quoting *Anderton v. Gentry*, 577 So. 2d 1261, 1263 (Ala. 1991)). In the absence of such a statement, a plaintiff must show "special damages," which "are the material harms that are the intended result or natural consequence of the slanderous statement, and [as a] general rule . . . are limited to *material loss capable of being measured in money*." *See id.* (internal quotations and citation omitted) (emphasis added).

Here, Plaintiffs have not asserted any allegations concerning a statement that "imputes to the plaintiff[s] an indictable offense involving infamy or moral turpitude," (*see* Doc. 24, ¶¶ 33-

17

45), and therefore must sufficiently plead special damages. *See Deneau*, 2013 WL 2178045, at *19 (quoting *Anderton*, 577 So. 2d at 1263). Plaintiffs fail to properly allege any special harm; but rather make multiple allusions to "injury to [Plaintiffs'] reputation in the eyes of the community and the public."[3] (Doc. 24, ¶¶ 39, 45). Similarly, in their deposition testimony, Plaintiffs could only speak to a general harm to reputation. (M. Adams Dep. 62:17-21; 63:1-3). Such vague allegations do not represent "material loss capable of being measured in money" and therefore fail to meet the requisite threshold for special damages. *See Deneau*, 2013 WL 2178045, at *19 (quoting *Anderton*, 577 So. 2d at 1263). Accordingly, Plaintiffs' defamation, libel, and slander claim cannot survive summary judgment.

### D.  Plaintiffs' Claim Under the Truth in Lending Act Fails as a Matter of Law

Plaintiffs' claims that BANA violated the Truth in Lending Act ("TILA") (Count Three) must fail because (1) these claims are time-barred under TILA's one-year statute of limitations (*see* 15 U.S.C. § 1640(e)); and (2) BANA is not a "creditor" as defined by the Act. *See Bush v. J.P. Morgan Chase Bank, N.A.*, No. 2:15-CV-00769-JEO, 2016 WL 324993, at *3 (N.D. Ala. Jan. 27, 2016) (citing 15 U.S.C. § 1604(a).).

Turning first to the statute of limitations argument, 15 U.S.C. § 1640(e) provides that "any action under this section may be brought . . . within one year from the date of the occurrence of

---

[3] Plaintiffs also make several accusations of suffering harm to their credit due to BANA's allegedly false statements. (Doc. 24, ¶¶ 33, 42). First, the Fair Credit Reporting Act preempts state law claims pertaining to the reporting of false credit information. *See, e.g.*, *Sigler v. RBC Bank*, 712 F. Supp. 2d 1265, 1269 (M.D. Ala. 2010) (quoting *Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1, 11 (D. Mass. 2004) (internal quotations omitted)). Second, as part of the agreement allowing the Plaintiffs to amend their complaint for a second time (Doc. 25), Plaintiffs agreed to amend their Defamation, Libel, and Slander claim and "remove any allegations pertaining to the publication of false credit information." (Doc. 25). For this reason, in addition to being preempted by the Fair Credit Reporting Act, Plaintiffs' allegations concerning credit-related damages should be disregard by the Court.

the violation." *Id.* The "date of occurrence" is the date when "the transaction is consummated." *Velardo v. Fremont Inv. & Loan*, 298 F. App'x 890, 892 (11th Cir. 2008); *Davis v. Wells Fargo Fin. Alabama Inc.*, No. 2:11-CV-02766-WMA, 2011 WL 12544180, at *2 (N.D. Ala. Dec. 8, 2011) (citing *In re Smith*, 737 F.2d 1549, 1552 (11th Cir. 1984)). Furthermore, under TILA, "[n]ondisclosure is not a continuing violation for purposes of the statute of limitations." *Knowles v. HBSC Bank USA*, No. CV-11-J-1953-S, 2012 WL 2153436, at *3 (N.D. Ala. June 8, 2012) (quoting *In re Smith*, 737 F.2d at 1552). As such, where a plaintiff is affirmatively seeking money damages for a violation of TILA, that claim must be brought within one year of the date that the mortgage loan is consummated. *Goff v. LaSalle Bank, N.A.*, No. 7:09-CV-147-TMP, 2010 WL 8991929, at *2 (N.D. Ala. Nov. 30, 2010), *report and recommendation adopted*, No. CV 09-S-147-W, 2012 WL 4953638 (N.D. Ala. Oct. 16, 2012), *aff'd*, 518 F. App'x 670 (11th Cir. 2013) ("The Truth In Lending Act provides for a one-year statute of limitations with respect to any action for damages."); *Velardo*, 298 F. App'x at 892; *Dixon v. Countrywide Home Loans, Inc.*, 710 F. Supp. 2d 1325, 1333 (S.D. Fla. 2010) ("Where monetary damages for violations of TILA are sought, there is a one-year statute of limitations.").

Here, Plaintiffs allege that BANA violated TILA and Regulation Z by failing to comply with applicable notice and disclosure requirements concerning their Loan. (*See* Doc. 24, ¶¶ 51; 53 – 55). Plaintiffs specifically address that their claim "is solely for money damages." (*Id.*, ¶ 49). Plaintiffs have waited too long to bring this claim. The latest possible date that could qualify as "the date of occurrence" is August 29, 2011 when the Mortgage and Note were modified by mutual agreement. (*See* ___ Aff., ¶ 11; M. Adams Dep. 77:12-18; 78:15-22; N. Adams Dep. 24:24-25:12; **Exhibit H**). As such, August 29, 2011 was the last date where a credit transaction was "consummated" between BANA and Plaintiffs. *See Velardo*, 298 F. App'x at 892; (*see also* ___

19

Aff., ¶ 20, **Exhibit R**). Consequently, Plaintiffs had to bring this claim for money damages on or before August 29, 2012—the deadline under the one-year statute of limitations. *See Goff*, 2010 WL 8991929, at *2; *Dixon*, 710 F. Supp. 2d at 1333. That Plaintiffs have failed to file before this date precludes their TILA claim.

Secondly, BANA does not qualify under TILA's strict definition of "creditor." "By its plain language, TILA's private right of action applies only to actions against 'creditors.'" *Bush*, 2016 WL 324993, at *3 (citing 15 U.S.C. § 1604(a).). TILA states:

> The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g). "The definition given in this sentence is restrictive and precise, referring *only* to a person who satisfies *both* requirements." *Rice v. JPMorgan Chase Bank NA*, No. 7:14-CV-00318-LSC, 2014 WL 3889472, at *4 (N.D. Ala. Aug. 5, 2014) (quoting *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 270 (4th Cir. 2008) (emphasis in original)).

Here, Plaintiffs cannot prove that BANA satisfies the second prong of TILA's "creditor" test. *See* 15 U.S.C. § 1602(g). As Plaintiffs note in their Second Amended Complaint, the Mortgage was made in favor of the lender, Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for Countrywide Home Loans, Inc. (Doc. 24, ¶ 5, *see also* ___ Aff., ¶ 5; **Exhibit B**). It is important to note that Countrywide Home Loans, Inc., the original lender, is an entirely different entity from Countrywide Home Loans Servicing, LP, the original mortgage servicer. (___ Aff., ¶¶ 5 – 6; Mills Dep. 26:22-27:6). The original mortgage servicer, Countrywide Home Loans Servicing, LP, changed its name to BAC Home Loans Servicing, LP, and BANA subsequently succeeded to the interests of BAC Home Loans Servicing, LP. (___ Aff., ¶ 6; Mills Dep. 26:10-

27:6). On the other hand, the original lender, Countrywide Home Loans, Inc., presently exists as an independent entity and never joined or merged with BANA. (Mills Dep. 23:20-24:9). In summary, BANA has serviced the Loan since its origination via BANA's absorption of Countrywide Home Loans Servicing, LP. (___ Aff., ¶ 6; Mills Dep. 26:10-27:6). But, as Plaintiffs acknowledge in their Second Amended Complaint, BANA only assumed the role as lender for the Loan since August 2, 2011 when MERS, solely as nominee for Countrywide Home Loans, Inc. assigned the Mortgage to BANA (*See* Doc. 24, ¶ 7; *see also* ___ Aff., ¶ 7; **Exhibit C**).

In view of this distinction, BANA cannot be considered a "creditor" under TILA because it was Countrywide Home Loans, Inc., and not BANA, "to whom the debt arising from the consumer credit transaction [was] initially payable on the face of the evidence of indebtedness." *See* 15 U.S.C. § 1602(g). Courts within this district have held that entities other than the original lender named in a mortgage cannot be considered a "creditor" under TILA. *E.g. Bush*, 2016 WL 324993, at *4 (holding that mortgage debt was not "initially payable" to defendant where defendant was not original lender); *Rice*, 2014 WL 3889472, at *4 (holding that defendant not a "creditor" under TILA where the mortgage named different entity as original lender). Because BANA was not the original lender named in the mortgage, it cannot be considered a "creditor" for purposes of TILA. *See id.* As a result, BANA is due summary judgment for Count Three.

### E.    BANA Properly Acknowledged and Responded to Plaintiffs' QWR

The sum of Plaintiffs' allegations under the Real Estate Settlement Procedures Act ("RESPA") (Count Four) is that BANA failed "to acknowledge or respond" to two Qualified Written Requests (QWRs) submitted by Plaintiffs on May 15, 2015 and July 17, 2015, respectively. (Doc. 24, ¶¶ 58 – 59). Plaintiffs' RESPA claim fails because (1) BANA properly acknowledged and responded to the QWR of July 17, 2015 (___ Aff., ¶ 21; M. Adams Dep. 95:2-

11, 96:8-97:1; **Exhibits T** and **U**); and (2) Plaintiffs have failed to produce evidence of a QWR from May 15, 2015 and further admit that they did not submit any other QWRs besides the QWR from July 17, 2015. (*See* M. Adams. Dep. 98:14-99:4).

Turning first to the July 17, 2015 QWR (**Exhibit S**), BANA acknowledged and responded to this QWR in a timely manner. (___ Aff., ¶ 21, M. Adams Dep. 95:2-11, 96:8-97:1; **Exhibits T** and **U**). Plaintiffs contend that "Defendant violated the Real Estate Settlement Procedures Act (REPA) [*sic*] by failing to acknowledge or respond to Adamses' Qualified Written Request (QWR) within the time provided by federal law." (Doc. 24, ¶ 58). RESPA requires that upon receiving a QWR, loan servicers must (1) provide a written acknowledgment of receipt of the QWR within five days, excluding Saturdays, Sundays, and public holidays; and (2) provide a written response to the QWR within thirty days excluding Saturdays, Sundays, and public holidays. 12 U.S.C. § 2605 (e). BANA fully complied with this statute by timely acknowledging and responding to Plaintiffs' July 17, 2015 QWR.

Specifically, BANA sent a written acknowledgment of Plaintiffs' July 17, 2015 QWR to their attorney, Kenneth J. Lay, on July 22, 2015. (___ Aff., ¶ 21; M. Adams Dep. 95:2-11, **Exhibit T**). This written acknowledgment was sent within three business days of July 17, 2015—well within the five day time period stipulated by RESPA. *See* 12 U.S.C. § 2605 (e). Second, on August 21, 2015—25 business days from July 17, 2015—BANA's legal counsel sent Plaintiffs a substantive response to their July 17, 2015 QWR. (___ Aff., ¶ 21; M. Adams Dep. 96:8-97:1; **Exhibit U**). Again, this response was timely as required by RESPA. *See* 12 U.S.C. § 2605 (e). As such, Plaintiffs' claims that BANA "violated the Real Estate Settlement Procedures Act (REPA) [*sic*] by failing to acknowledge or respond to Adamses' Qualified Written Request (QWR) within the time provided by federal law" is completely groundless. (*See* Doc. 24, ¶ 58; *see also* (___ Aff.,

22

¶ 21; M. Adams Dep. 95:2-11, 96:8-97:1; **Exhibits T** and **U**). Accordingly, the Court must reject Plaintiffs' claims regarding their July 17, 2015.

Looking next to the alleged QWR of May 15, 2015, BANA has no record of receiving any other QWR from Plaintiffs beyond the July 17, 2015 QWR. (___ Aff., ¶ 21). Indeed, Plaintiffs have produced no evidence that such a QWR exists. Furthermore, Plaintiffs admit that they did not submit any additional QWRs besides the July 17, 2015 QWR. (*See* M. Adams. Dep. 98:14-99:4). Given that (1) BANA timely and properly acknowledged and responded to Plaintiffs' July 17, 2015 QWR; and (2) there is no evidence that the May 15, 2015 QWR exists, summary judgment must be granted as to Plaintiffs' RESPA claim.

## F.     BANA Never Received Notice of a Credit Dispute from a CRA

Plaintiffs' claim under the Fair Credit Reporting Act ("FCRA") (Count Five) fails because BANA was never informed of a credit dispute by a consumer reporting agency ("CRA"). (*See* ___ Aff., ¶ 22).

As a preliminary matter, based upon Plaintiffs' allegations, BANA was acting as a "furnisher" of information for purposes of FCRA. (*See* Doc. 24, ¶ 61). A furnisher has two primary duties under FCRA: (1) a furnisher may not provide inaccurate information to consumer reporting agencies ("CRAs"); and (2) a furnisher must conduct an investigation to verify the accuracy of its reporting when a CRA notifies the furnisher of a dispute regarding the information provided. 15 U.S.C. § 1681s-2(a) & (b).

Turning first to subsection (a) of section 1681s-2, in addition to imposing a duty on furnishers to provide accurate information, it also prohibits a furnisher from reporting information that the furnisher knows or has reasonable cause to believe is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A). Furthermore, § 1681s-2(a) prohibits a furnisher from furnishing information to a CRA

if the furnisher has been notified by a consumer that the information is inaccurate, and the information is in fact inaccurate. 15 U.S.C. § 1681s-2(a)(1)(B)(i), (ii). With that stated, Congress made clear that a private right of action does not exist for violations of § 1681s-2(a). 15 U.S.C.§ 1681s-2(c)(1); *Rice*, 2014 WL 3889472, at *5 (citing *Peart v. Shippie*, 345 F. App'x 384, 386 (11th Cir. 2009) ("[T]he statute explicitly bars private suits for violations of [15 U.S.C. § 1681s–2(a)].")); *Green v. RBS Nat'l Bank,* 288 F. App'x 641, 642 (11th Cir. 2008)).

Considering that Congress precluded private rights of action predicated on 15 U.S.C. § 1681s–2(a), "a consumer *only* has a private right of action for violations of 15 U.S.C. § 1681s–2(b)." *Rice*, 2014 WL 3889472, at *5 (citing *Peart*, 345 F. App'x at 386; *Green*, 288 F. App'x at 642) (emphasis in original). A furnisher's duties under this subsection—to conduct an investigation to verify the accuracy of its credit reporting—are only in force after a CRA notifies the furnisher of a dispute regarding the completeness or accuracy of the information provided. *Rice*, 2014 WL 3889472, at *5 (quoting 15 U.S.C. § 1681s–2(b)(1)).

Plaintiffs' FCRA count involves multiple allegations pertaining to BANA's reporting of information to CRAs. For example, Plaintiffs state that BANA "inaccurately report[ed] that the Adamses were delinquent in their mortgage loan and in Default"; "reported the false, derogatory information to the consumer reporting agencies in violation of their duties as a furnisher of credit"; and "falsely reported about Plaintiffs' disputed debt." (Doc. 24, ¶¶ 61 – 63). All of these allegations pertain to the duty of credit furnishers to report accurate information to CRAs governed by 15 U.S.C. § 1681s–2(a). Because Congress did not allow for a private right of action under 15 U.S.C. § 1681s–2(a), Plaintiffs' attempt to bring a civil action under the same cannot be sustained. *See Rice*, 2014 WL 3889472, at *5 (citing *Peart*, 345 F. App'x at 386).

After removing all of Plaintiffs' allegations that are not actionable under 15 U.S.C. § 1681s–2(a), all that is left of Plaintiffs' FCRA claim is that BANA "failed to conduct a reasonable investigation with respect to consumer credit date it reported about the Plaintiffs." (Doc. 24, ¶ 66). As previously mentioned, a furnisher of credit information only has a duty to investigate the accuracy of its reporting when it is contacted by a CRA regarding the completeness or accuracy of the information provided. *Rice*, 2014 WL 3889472, at *5 (quoting 15 U.S.C. § 1681s–2(b)(1)). Plaintiffs admit that they never attempted to contact a CRA to dispute the status of their credit report. (M. Adams Dep. 71:6-19; N. Adams Dep. 46:2-8). As such, BANA was never contacted by a CRA regarding the same. (*See* ___ Aff., ¶ 22). Given this fact, BANA's duty to investigate was never triggered. *Rice*, 2014 WL 3889472, at *5 (citing *Peart*, 345 F. App'x at 386; *Green*, 288 F. App'x at 642). Because there is no private right of action for the majority of Plaintiffs' FCRA claims, and BANA violated no other duty under the Act, Plaintiffs' Count Five cannot survive summary judgment.

### G.      BANA is Not Liable Under the FDCPA

Plaintiffs' claims under the Fair Debt Collection Practices Act (FDCPA) (Count Six) fail because BANA (1) is not a "debt collector" as defined by the Act; and (2) did not engage in "debt collection" for purposes of the Act. *See Summerlin v. Shellpoint Mortgage Servs.*, No. 2:15-CV-00039-RDP, 2016 WL 778027, at *8 (N.D. Ala. Feb. 29, 2016).

"To state a claim under the FDCPA, a plaintiff must establish, among other things, that the defendant is a 'debt collector.'" *Prickett v. BAC Home Loans & Bank of Am, N.A.*, 946 F. Supp. 2d 1236, 1248 (N.D. Ala. 2013). For purposes of the FDCPA, the definition of "debt collector" excludes persons collecting a debt when the debt was not in default at the time the person obtained the debt. *Id.* Thus, a mortgage servicer is not a "debt collector" when "its debt collection activities

involved a debt that was not in default at the time" it became the servicer. *Summerlin*, 2016 WL 778027, at \*8 (citing *Fenello v. Bank of America, N.A.*, 577 Fed. App'x. 899, 902 (11th Cir. 2014) (per curiam)).

BANA is not a "debt collector" under the FDCPA. BANA has serviced the Loan since its origination, as BANA succeeded to the interests of BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP—the original entity servicing the Loan. (\_\_\_ Aff., ¶ 6; Mills Dep. 26:10-27:6). Other courts within this Circuit, when confronted with an FDCPA claim against BANA, have explicitly held that BANA was not a "debt collector" where its predecessor-in-interest began servicing the mortgage prior to any default. *E.g.*, *Fenello v. Bank of Am., N.A.*, 926 F. Supp. 2d 1342, 1350–51 (N.D. Ga. 2013), *aff'd sub nom. Fenello v. Bank of Am., NA*, 577 F. App'x 899 (11th Cir. 2014) (holding that BANA not "debt collector" where BAC Home Loans Servicing, LP commenced servicing of mortgage prior to default); *see also Forester v. Bank of Am., N.A.*, No. CIV.A. 11-0160-CG-M, 2012 WL 3206471, at \*7 (S.D. Ala. Aug. 7, 2012) (holding that BAC Home Loans Servicing, LP not "debt collector" where Countrywide Home Loans Servicing, LP serviced mortgage since origination). Consequently, BANA is not a "debt collector" under the FDCPA because the Loan was not in default when Countrywide Home Loans Servicing, LP, BANA's predecessor-in-interest, began servicing the Loan. *See Fenello*, 926 F. Supp. 2d at 1350–51.

Even if the Court finds that BANA is a "debt collector", this Court has held that "an enforcer of a security interest . . . foreclosing on mortgages of real property . . . falls outside the ambit of the FDCPA except for the provisions of section 1692f(6)." *Summerlin*, 2016 WL 778027, at \*8 (quoting *Warren v. Countrywide Home Loans, Inc.*, 342 Fed. App'x. 458, 460–61 (11th Cir. 2009)). Here, although Plaintiffs sues BANA under multiple sections of the FDCPA, they

26

specifically omit any reference to 1692f(6). (*See* Doc. 24, ¶ 73 – 74). As such, all of the FDCPA sections to which Plaintiffs cite are inapplicable to BANA as an enforcer of a security interest, attempting to foreclose. *Summerlin*, 2016 WL 778027, at *8 (quoting *Warren*, 342 Fed. App'x. at 460–61).

Finally, BANA did not engage in "debt collection" activity for purposes of the FDCPA. As this Court has recently noted, "[T]he potential foreclosure of Plaintiff's home is not a 'debt collection' for purposes of the FDCPA. *Summerlin*, 2016 WL 778027, at *9 (citing *Roberts v. Chase Home Fin.*, No. 12–1883, 2012 WL 2862033, at *2 (N.D. Ala. July 11, 2012). "[I]f a person enforcing a security interest is not a debt collector, it likewise is reasonable to conclude that enforcement of a security instrument through the foreclosure process is not debt collection for purposes of the [FDCPA]." (quoting *Warren*, 342 Fed. App'x. at 460). For this additional reason, BANA is due summary judgment on Plaintiffs' FDCPA claim.

### H.    Plaintiffs Consented to BANA Calling Their Cell Phones

Plaintiffs' claims under the Telephone Consumer Protection Act ("TCPA") (Count Seven) fail because Plaintiffs consented in writing, multiple times, to BANA contacting them at their cell phone numbers. (____ Aff., ¶ 16; M. Adams Dep. 12:10-13:4; N. Adams Dep. 9:16-25; **Exhibits M**, **N**, and **O**).

"[A] person does not violate the TCPA if the call is "made for emergency purposes or made with the prior express consent of the called party." *Page v. Regions Bank*, 917 F. Supp. 2d 1214, 1216–17 (N.D. Ala. 2012) (citing 47 U.S.C. § 227(b)(1)(A)). "'Prior express consent' to receive a call is given when the 'called party' voluntarily proffers her telephone number to the calling party." *Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-CV-02902-CLS, 2012 WL 5511039, at *6 (N.D. Ala. Nov. 9, 2012); *see also In re Rules and Regulations,* 7 FCC Rcd. at 8769, ¶ 31 ("[U]nder the

prohibitions set forth in § 227(b)(1) . . . persons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.").

Here, Plaintiffs each provided their cell phone number to BANA in connection with various applications for loan assistance. (___ Aff., ¶ 16; M. Adams Dep. 12:10-13:4; N. Adams Dep. 9:16-25; **Exhibits M**, **N**, and **O**). Plaintiffs acknowledged that the cell phone numbers provided on these three signed applications—dated April 1, 2013, March 8, 2014, and July 21, 2014, respectively—had been their assigned cell phone numbers for at least the last five years. (M. Adams Dep. 12:10-13:4; N. Adams Dep. 9:16-25). On each of these three signed applications for loan assistance, Plaintiffs agreed to the following: "I consent to being contacted concerning this request for mortgage assistance at any e-mail addresses or cellular or mobile telephone number I have provided to the Servicer." (___ Aff., ¶ 16; **Exhibits M**, **N**, and **O**). Because Plaintiffs provided their express, written consent to BANA to contact them at their cell phone numbers, Plaintiffs' TCPA claim does not hold water, and BANA is due summary judgment on the same. *See Pinkard*, 2012 WL 5511039, at *6.[4]

## I.     Plaintiffs Were Not Victims of Discrimination

Plaintiffs' claim under the Equal Credit Opportunity Act ("ECOA") (Count Eight) must fail because Plaintiffs are not members of a protected class, and consequently have not been the victims of discrimination. (M. Adams Dep. 9:23-10:21; 104:6-9; N. Adams Dep. 8:16-9:3; 36:7-10).

---

[4] In addition to providing their express, written consent to be contacted at their cell phone numbers, Plaintiffs' TCPA claim fails because they have produced zero evidence that they were ever called using any automatic telephone dialing system. All that the Plaintiffs have provided is a bare recitation of the TCPA's statutory prohibition against using automatic telephone dialing systems, without producing any proof that BANA actually utilized such systems to call Plaintiffs. (*See* Doc. 24, ¶ 76 – 77).

The ECOA states, "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691 (*see also* Doc. 24, ¶ 78). Accordingly, "discrimination on the basis of some protected class (such as race) is a vital component to plaintiffs' ECOA claim." *Nicholson v. Johanns*, No. 06-0635-WS-B, 2007 WL 3407045, at *5 (S.D. Ala. Nov. 13, 2007) (citing *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 406-07 (6th Cir. 1998)); *Prince v. U.S. Bank Nat. Ass'n*, No. CIV.A.0800574KDN, 2009 WL 2998141, at *8 (S.D. Ala. Sept. 14, 2009).

This is because "[t]he ECOA is not a general, catch-all, prophylactic remedy allowing any disgruntled debtor to sue a creditor for any slight, real or imagined; rather, the conduct it proscribes is the discriminatory administration of a credit transaction. Without proof of discrimination, plaintiffs have no cognizable ECOA claim." *Nicholson*, 2007 WL 3407045, at *5. In order to assert such discrimination, a plaintiff must allege that the defendant gave preferential treatment to other, similarly qualified applicants who were outside of the plaintiff's protected class. *See Cooley v. Sterling Bank*, 280 F. Supp. 2d 1331, 1339 (M.D. Ala. 2003) (citing *Rowe v. Union Planters Bank*, 289 F.3d 533, 535 (8th Cir. 2002) (listing prima facie elements for credit discrimination claim brought under the ECOA); *Sallion v. SunTrust Bank, Atlanta*, 87 F. Supp. 2d 1323, 1327 (N.D. Ga. 2000) (same)).

Here, Plaintiffs acknowledge that they are middle-aged, married, Caucasian borrowers, who have lived in Bessemer, Alabama their whole lives. (M. Adams Dep. 9:23-10:21; 104:6-9; N. Adams Dep. 8:16-9:3; 36:7-10). As such, they cannot argue in good faith that they were the victims of discrimination based on a protected characteristic. (*See id.*). Nor can they prove that BANA treated other applicants differently who were similarly qualified, but outside of Plaintiffs'

hypothetically protected class. *See Cooley*, 280 F. Supp. 2d at 1339 (M.D. Ala. 2003). BANA initiated foreclosure proceedings against Plaintiffs not on the basis of discrimination; but rather, because Plaintiffs repeatedly failed to pay their mortgage for months at a time. (___ Aff., ¶ 12; Mills Dep. 67:4-69:8; **Exhibit J**). As such, the Plaintiffs are impermissibly using the ECOA to lob yet another grievance against BANA for properly enforcing its security interest. *See Nicholson*, 2007 WL 3407045, at \*5. Thus, BANA is due summary judgment as to Count Eight.

## CONCLUSION

As BANA's evidence has shown, Plaintiffs repeatedly struggled to make their mortgage payments, despite receiving two separate loan modifications from BANA. BANA continually attempted to work with Plaintiffs—even offering them a chance for a third loan modification—but Plaintiffs' inability to consistently make timely payments compelled BANA to foreclose. Given the weight of evidence demonstrating Plaintiffs' failure to comply with their contractual obligations, and the lack of proof that BANA committed any wrongdoing, BANA is due summary judgment on all counts.

Respectfully submitted this 1st day of August, 2016,

*/s/* J. Jackson Hill, IV
Brian A. Wahl
J. Jackson Hill, IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
bwahl@babc.com
jhill@babc.com
ATTORNEYS FOR BANK OF AMERICA, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2016, I served a copy of the foregoing via the Court's electronic filing system or by first-class U.S. mail, postage prepaid, where appropriate, to the following:

Kenneth J. Lay
HOOD & LAY, LLC
1117 22nd Street South, Suite 101
Birmingham, AL 35205
kenneth.j.lay@gmail.com
ATTORNEY FOR MICHAEL AND NATALIE ADAMS

/s/ J. Jackson Hill, IV
OF COUNSEL

31